## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KANG KYU SEO, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>CHARLES MOON SUK OH, *et al.*,<br><br>    *Defendants*. | No. 18-785 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, four former employees of a liquor store in Washington D.C., allege that Defendants willfully failed to pay them minimum and overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and the District of Columbia Wage Payment and Collection Law ("DCWPCL"), D.C. Code § 32-1301 *et seq*.  *See* Dkt. 1 at 1–2 (Compl.).  Now before the Court are Plaintiffs' motion for summary judgment, Dkt. 22, and Defendants' cross-motion for summary judgment with respect to one Plaintiff, Dkt. 23.  Because genuine disputes of material fact preclude the granting of summary judgment in favor of either side, the Court will **DENY** Plaintiffs' motion and will **DENY** Defendants' cross-motion.

## I.  BACKGROUND

### A.    Legal Background

####     1.    *Fair Labor Standards Act*

Congress enacted the FLSA to address conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a).  To that end, the Act guarantees both a minimum wage, *id.* § 206, and overtime pay for any "workweek longer than forty hours," *id.* § 207(a)(2)(C).  The

federal minimum wage is $7.25 per hour, *id.* § 206(a)(1)(C); *see also McNair v. District of Columbia*, 359 F. Supp. 3d 1, 11 (D.D.C. 2019), and overtime pay must equal at least "one and one-half times" an employee's "regular" hourly rate, 29 U.S.C. § 207(a)(2).

These provisions, however, apply only to certain employers. As relevant here, Section 207's overtime requirements "govern[] only employers who are part of an 'enterprise engaged in commerce or in the production of goods for commerce.'" *Morales v. Humphrey*, 187 F. Supp. 3d 163, 167 (D.D.C. 2016) (quoting 29 U.S.C. § 207(a)(1)). Section 206's minimum-wage provisions, likewise, apply only to those who are "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a).

The FLSA defines an "enterprise engaged in commerce or in the production of goods for commerce" as one that "has employees engaged in commerce" and "whose annual gross volume of sales made or business done is not less than $500,000." *Id.* § 203(s)(1)(A)(i)–(ii). "Commerce," in turn, "means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." *Id.* § 203(b). These definitions are "construed . . . 'liberally to apply to the furthest reaches consistent with congressional direction,'" because "broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency." *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 296 (1985) (quoting *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959)).

Even for covered employers, the FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); *see also Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886, 892 (D.C. Cir. 2010). For purposes of this exemption, the Department of Labor defines an "executive" employee as follows:

(a) The term 'employee employed in a bona fide executive capacity' in section 13(a)(1) of the Act shall mean any employee:

    (1) Compensated on a salary basis . . . at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;[1]

    (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

    (3) Who customarily and regularly directs the work of two or more other employees; and

    (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. An employer "bears the burden of proving that its employees are exempt," and "exemptions from the FLSA's reach must be narrowly construed against the employer in order to further Congress' goal of affording broad federal employment protection." *Figueroa v. District of Columbia.*, 869 F. Supp. 2d 66, 72 (D.D.C. 2012).

    2.     *D.C. Minimum Wage Act & D.C. Wage Payment and Collection Law*

    D.C. law separately imposes minimum-wage and overtime-pay requirements on employers in the District of Columbia. Two different laws combine to create the scheme relevant to this litigation: the DCWPCL and the D.C. Minimum Wage Act ("DCMWA"), D.C. Code § 32-1003 *et seq.* Like the FLSA, the DCMWA sets a "minimum hourly wage," *id.* § 32-1003(a)(5), and imposes an overtime-pay requirement for "employment in excess of 40 hours" per week, *id.* § 32-1003(c). The DCMWA's overtime rate, "1 ½ times the regular rate," *id.*,

---

[1] The salary threshold for this exemption increased from $455 per week to $684 per week on January 1, 2021, although that change post-dates the events relevant to this matter. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51230, 51235 (Sept. 27, 2019).

tracks the FLSA's equivalent, *see* 29 U.S.C. § 207(a)(2)(C).  The minimum wage set by D.C. law, however, has long exceeded the $7.25 hourly rate guaranteed by the FLSA.  The "minimum hourly wage" required by the DCMWA has steadily increased from, as relevant here, $11.50 starting on July 1, 2016, to $13.25 as of July 1, 2018.  D.C. Code § 32-1003(5)(A).

While the DCMWA sets the minimum wages and overtime premiums under D.C. law, the DCWPCL "establishes requirements for the payment of [these] wages," *Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 146 (D.D.C. 2011).  Under the DCWPCL, D.C. employers are required to "pay all wages earned" by its "employees on regular paydays," D.C. Code. § 32-1302, and, when an employee (who does not have a written contract) "quits or resigns, the employer shall pay the employee's wages due upon the next regular payday or within 7 days from the date of quitting or resigning," *id*. at § 32-1303(2).  "Wages," in turn, are defined to include "[o]vertime premium[s]" and all "[o]ther remuneration promised or owed[] . . . [p]ursuant to District or federal law," *id.* § 32-1301(3), thereby incorporating the minimum wage and the overtime provisions provided for by the DCMWA, *see id.* §§ 32-1003(a) & (c).

D.C. law, like the FLSA, exempts certain employees from these requirements; specifically, the DCMWA "provides for the same executive exemption" as the FLSA. *Hernandez v. Stringer*, 210 F. Supp. 3d 54, 59 n.2 (D.D.C. 2016); *see also* D.C. Code § 32-1004(a)(1) (exempting "[a]ny employee employed in a bona fide executive, administrative, or professional capacity . . . (as these terms are defined by the Secretary of Labor under 201 *et seq.* of the Fair Labor Standards Act)").  "With respect to employers' liability," therefore, "the DCMWA and DCWPCL are construed consistently with the FLSA."  *Hernandez*, 210 F. Supp. 3d at 59 n.2 (alterations omitted) (quoting *Thompson*, 779 F. Supp. at 146); *accord Orellana v. NBSB Inc.*, 332 F. Supp. 3d 252, 257 (D.D.C. 2018).

4

## B.    Factual Background

Plaintiffs Keong Kyu Seo, Danita Evette Chase, Michelle Johnson, and Tamora Agnew are former employees of Charlie's Corner, a liquor store in Washington, D.C.  Dkt. 1 (Compl. 1–2); Dkt. 22-1 at 2 (Defs.' Resp. to Pls.' Req. for Admis. ¶ 1) (admitting that "[e]ach plaintiff . . . was an 'employee'" as defined by FLSA).  Wade Road, Inc., one of the Defendants, is a D.C. corporation that owns Charlie's Corner, Dkt. 1 at 3 (Compl. ¶¶ 10–11), and Charles Oh, the other Defendant, is the sole owner of Wade Road, *see* Dkt. 22-1 at 23 (Defs.' Resp. to Pls.' Interrogs. ¶ 20) (identifying Oh as Wade Road's sole "owner"); Dkt. 22-10 at 10 (Oh Dep. 10:17–11:5) (acknowledging that Oh is the only "shareholder" in Wade Road).  Plaintiffs filed this FLSA and DCWPCL action against Wade Road and Oh, alleging that both are liable for failure to pay minimum wages and overtime wages.  Dkt. 1 (Compl. 1–2).

Although the Court typically endeavors, at summary judgment, to "recount[] . . . the facts that the parties do not dispute," *Psak v. Bernhardt*, No. 14-cv-116, 2020 WL 2849985, at *1 (D.D.C. June 1, 2020), as detailed below nearly every fact in this case is in dispute.  The Court will, therefore, summarize the record as to each Plaintiff's employment—including, where relevant, the parties' disagreements—before turning to the parties' cross-motions.

### 1.    *Keong Kyu Seo*

The parties agree that Seo worked at Charlie's Corner for approximately 26 weeks, from February 16, 2017 to September 1, 2017, *see* Dkt. 22-2 at 3 (Answer ¶ 13), although they dispute the nature of his duties.  Plaintiffs maintain that "Seo worked as a cashier," Dkt. 1 (Compl. ¶ 14), with "no managerial responsibilities," Dkt. 22-9 at 1 (Seo Decl.), while Defendants argue that he served as the store's "manager," Dkt. 22-1 at 10 (Defs.' Resp. to Pls.' Req. for Admis. ¶ 2), who "was almost, like, the owner," Dkt. 22-10 at 37 (Oh Dep. 73:20); *see also* Dkt. 22-1 at 15 (Defs.'

Resp. to Pls.' Interrogs. ¶ 3) ("Wade Road hired Mr. Seo to work as a manager.").

Plaintiffs add that Seo "typically worked six (6) or seven (7) days per week," "starting around 9:00–10:00 a.m. and end[ing] anywhere from 9:00–11:00 p.m."  Dkt. 22-9 at 1 (Seo Decl.).  That schedule amounted to roughly 72 hours per week, according to Seo, meaning that he is "owed an overtime premium for approximately 896 overtime hours," for a total of "at least $7,728."  *Id.*  Defendants maintain that, as the store's manager, Seo was exempt from federal and D.C. minimum-wage and overtime requirements, Dkt. 23 at 9–10, adding that Seo "was initially paid $5,000.00 in March 2017 and later was paid [a] monthly salary of $6,000," good for an annualized rate of $72,000, Dkt. 22-1 at 15 (Defs.' Resp. to Pls.' Interrogs. ¶ 3).

2. *Other Plaintiffs*

Aside from Seo, Defendants concede that the "rest of the plaintiffs"—that is, Chase, Johnson, and Agnew—"were employees who worked as cashiers" and, as such, had no managerial responsibilities.  Dkt. 22-1 at 17 (Defs.' Resp. to Pls.' Interrogs. ¶ 4); Dkt. 23 at 3 ("Admitted that, apart from Mr. Seo, other Plaintiffs worked as [] cashier[s].").  The parties disagree, however, as to the length of their employment and the extent of their compensation.

a.   Danita Evette Chase

Plaintiffs contend that Chase worked at Charlie's Corner from May 2016 through February 2017.  Dkt. 22-9 at 2 (Chase Decl.); *see also* Dkt. 22-11 at 2 (Chase Dep. 11:12–11:18) ("I started working for Mr. Oh May of 2016.").  In contrast, Defendants maintain that she "worked [only] from February 10, 2017 to February 29, 2017," Dkt. 22-1 at 16 (Defs.' Resp. to Pls.' Interrogs. ¶ 3).[2]  According to Chase, she "typically worked six (6) or seven (7)

_____

[2]  As Plaintiffs correctly observe, Dkt. 25 at 8 n.8, Defendants' assertion that Chase worked until "February 29, 2017," Dkt. 22-1 at 16 (Defs.' Resp. to Pls.' Interrogs. ¶ 3), cannot be correct—

days per week," including from 9:00 a.m. to 5:00 p.m. on Mondays, Tuesdays, Thursdays, Fridays, and Saturdays and from 9:00 a.m. to 9:00 p.m. on Wednesdays and Sundays.  Dkt. 22-9 at 2 (Chase Decl.); Dkt. 22-11 at 3 (Chase Dep. 12:5–12:9).  Defendants do not directly controvert these numbers, arguing instead that (1) "[t]here are no work schedule[s] made by Defendants because Mr. Seo was responsible for scheduling the employees under his management," Dkt. 22-1 at 17 (Defs.' Resp. to Pls.' Interrogs. ¶ 4), but (2) "Chase could not have worked the hours she claimed in the complaint," Dkt. 23-16 at 2 (Oh Decl. ¶ 12).

Because, Chase says, she "was only paid for twenty (20) hours per week at a rate of $11.00 per hour," she "believe[s]" she is "owed $29,950 in unpaid minimum wages and overtime wages."  Dkt. 22-9 at 2 (Chase Decl.); *but see* Dkt. 22-11 at 4–5 (Chase Dep. 13:22–14:3) ("Far as I know, he was paying me eight dollars an hour, sir.").  She acknowledges, however, that "occasionally" she received "payments made in cash, food, sundries, cigarettes[,] and alcohol" for "these hours worked in excess of twenty (20) per week."  Dkt. 22-9 at 2 (Chase Decl.).  She "did not keep track of the exact amounts of these payments."  *Id.*  Defendants respond that Chase "did not work overtime [and] so was not eligible for overtime payment," Dkt. 22-1 at 14 (Defs.' Resp. to Pls.' Interrogs. ¶ 1), and that all employees—including Chase—"were paid at least the minimum wage," *id.* at 15 (Defs.' Resp. to Pls.' Interrogs. ¶ 3).

    b.    <u>Michelle Johnson</u>

Johnson attests that she worked for approximately 50 weeks, from January 2017 through February 2018, in both full-time and part-time capacities.  Dkt. 22-9 at 3 (Johnson Decl.); *see*

---

2017 was not a leap year.  *See United States v. Neill*, 964 F. Supp. 438, 445 & n.8 (D.D.C. 1997) (noting that courts may take judicial notice of "fact[s] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," including "calendars" (citations and quotation marks omitted)).

*also* Dkt. 22-12 at 3 (Johnson Dep. 11:2–11:7).  Johnson submits that, while working full-time, she worked between 40 and 70 hours per week and, while working part-time, she worked a total of roughly 100 hours.  Dkt. 22-9 at 3 (Johnson Decl.).  Because she was "only paid for thirty (30) hours per week at a rate of $11.00 per hour," Johnson estimates that Defendants owe her "approximately $25,000 in unpaid minimum wages and overtime wages."  *Id.*; *but see* Dkt. 22-12 at 6 (Johnson Dep. 14:2 –14:12) (estimating that her "hourly rate of pay" was "like eight, no more than nine," dollars per hour).  Like Chase, Johnson acknowledges that she was "sporadically" paid for her "hours worked in excess of thirty (30) per week . . . in cash, food, sundries, cigarettes[,] and alcohol" and that she "did not keep track of the exact amounts of these payments."  Dkt. 22-9 at 3 (Johnson Decl.).

Defendants object to Johnson's declared start date of January 2017, pointing to an I-9 employment eligibility verification form indicating that she started in March 2017.  Dkt. 23 at 6; *see also* Dkt. 23-15 at 3.  In addition, Defendants claim that all employees, including Johnson, were paid "at least the minimum wage" and that, on March 13, 2018, Johnson and Wade Road "entered into an agreement whereby Ms. Johnson was compensated for any overtime that was not paid."  Dkt. 22-1 at 14–15 (Defs.' Resp. to Pls.' Interrogs. ¶¶ 1–3); *see also* Dkt. 23-16 at 2 (Oh Decl. ¶ 14) ("Whatever unpaid wages or overtime I might have owed Michelle Johnson was settled via our agreement and payment of $500 on March 13, 2018.").

### c.     Tamora Agnew

Agnew attests that she worked at Charlie's Corner for approximately 28 weeks, from February 2017 through August 2017.  Dkt. 22-9 at 4 (Agnew Decl.).  During that time, Agnew allegedly worked six days a week from 8:00 a.m. to 5:00 p.m., "for an average of approximately fifty-four (54) hours per week."  *Id.*; *see also* Dkt. 22-13 at 2–3 (Agnew Dep. 9:17–10:14

(describing this work schedule).  Agnew asserts that she was paid only for 30 hours of work per week at a rate of $11.00 per hour.  Dkt. 22-9 at 4 (Agnew Decl.).  Accordingly, she calculates that she is "owed $12,110 in unpaid minimum wages and overtime wages."  *Id.*

In response, Defendants rely on the same assertion they levy against each of the other Plaintiffs—that all employees were paid "at least the minimum wage."  Dkt. 22-1 at 15 (Defs.' Resp. to Pls.' Interrogs. ¶ 3).  Oh, moreover, claims that Agnew only worked the "morning shift [] from 9:00 am to 1:00 pm, and [thus] could not have worked the hours claimed in the complaint."  Dkt. 23-16 at 2 (Oh Decl. ¶ 13).  Oh further disputes Agnew's start and end dates, insisting that she "worked [only] from March 18, 2017 to July 21, 2017."  *Id.*  Neither party seems certain of exactly how much Defendants compensated Agnew, however, likely because— at least according to Agnew—in lieu of paystubs she received handwritten notes "on a Lottery ticket sheet of paper."  Dkt. 22-13 at 9 (Agnew Dep. 23:1–23:14).

## C.    Procedural History

Plaintiffs filed this action on April 5, 2018.  Dkt. 1.  Although fact discovery closed on December 28, 2018, Dkt. 10, that date came and went without Defendants responding to any of Plaintiffs' discovery requests, including a detailed set of requests for admission, *see* Dkt. 12-1. Plaintiffs then moved for summary judgment, relying almost entirely on these unanswered requests for admission, which they asserted were deemed admitted due to Defendants' failure to respond.  Dkt. 12 at 2–3; *see also* Fed. R. Civ. P. 36(a)(3).  Defendants responded by moving to withdraw or amend their (non)responses to Plaintiffs' requests for admission.  Dkt. 14.

The Court granted Defendants' motion and denied, without prejudice, Plaintiffs' motion for summary judgment.  *See* Dkt. 17.  The Court reasoned that "because Plaintiffs demanded admissions as to each essential element of their claims, deeming them admitted would preclude

9

any presentation on the merits." *Id.* at 7.  To avoid that harsh result (and in light of the policy

favoring adjudication on the merits), the Court "order[ed] that Defendants respond to all

outstanding discovery requests—in full and in the manner prescribed by the rules—within 21

days." *Id.* at 10.  And, to account for Defendants' "disregard for their discovery obligations," the

Court awarded Plaintiffs their "reasonable attorneys' fees in preparing their motion for summary

judgment in reliance on Defendants' failure to timely respond to" Plaintiffs' discovery requests.

*Id.* at 10–11.  Because Plaintiffs' "motion" for summary judgment was "premised in large part

on Defendants' now-defunct admissions," the Court held that resolution of that motion was

"premature." *Id.* at 11.

The Court subsequently extended the close of fact discovery until August 31, 2020.  *See*

Minute Entry (July 2, 2020).  That deadline has now passed, the parties have exchanged

discovery, and each has moved for summary judgment.  *See* Dkt. 22; Dkt. 24.

## II.  LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it

can "show[ ] that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment

"bears the initial responsibility" of "identifying those portions" of the record that "demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  A fact is "material" if it could affect the outcome of the litigation under governing law.

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott

v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most

favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

## III.  ANALYSIS

Plaintiffs move for summary judgment on the first two counts in their complaint, which allege that Defendants failed to pay overtime wages and minimum wages in violation of the FLSA and the DCWPCL.[3]  Dkt. 22 at 27–28.  Defendants oppose Plaintiffs' motion, arguing that "there [are] . . . disputed facts regarding when some employees worked . . . and what was/was not paid."  Dkt. 23 at 11.  Although asserting that most of the claims at issue require resolution of disputed facts, Defendants contend that one issue—whether Plaintiff Michelle Johnson entered

---

[3]  Although Plaintiffs' complaint includes a third count for fraudulent filing of tax information returns, Dkt. 1 at 11–13 (alleging violation of 26 U.S.C. § 7434), this Court dismissed that claim at Plaintiffs' request in a prior memorandum opinion and order, Dkt. 17 at 2 n.1.

into a settlement agreement resolving "all claims related to wage payment and overtime"—can

be resolved based on the undisputed record, and they cross-move for summary judgment on that

one issue.  *Id.* at 10.

As detailed below, the Court concludes (1) that genuine disputes of material fact preclude

judgment in favor of Plaintiffs, and (2) that the purported settlement agreement on which

Defendants rely does not include a release of claims and, in any event, is unenforceable on the

present record.

**A.      Plaintiffs' Motion for Summary Judgment**

The Court begins with Plaintiffs' motion for summary judgment.  Plaintiffs argue that

during their time at Charlie's Corner they did not receive the minimum wages and overtime

premiums to which they are entitled under federal and D.C. law.  Dkt. 22 at 27–28.  As a result,

Plaintiffs claim that their employers—whom they identify as Oh and Wade Road—owe them

nearly $300,000 in unpaid wages and liquidated damages.  *Id.* at 28.  Defendants respond with a

battery of threshold objections, but at bottom their position is that they "have paid all the wages

due to Plaintiffs."  Dkt. 23 at 2.  The Court begins with Defendants' myriad assertions that the

FLSA and DCPWCL do not govern Plaintiffs' employment, either in whole or in part, before

turning to the core question of whether Defendants appropriately compensated Plaintiffs for their

work at Charlie's Corner.

1.      *The Application of the FLSA and DCPWCL*

Defendants press three arguments why, in their view, Plaintiffs' reliance on the FLSA

and the DCPWCL is misplaced.  They argue that (1) Charlie's Corner was not engaged in

"interstate commerce," and, as such, the FLSA does not apply, Dkt. 23 at 8–9; (2) Charlie Oh is

not liable to Plaintiffs in his individual capacity because only Wade Road employed Plaintiffs,

*id.* at 2; and (3) Seo served as Charlie's Corner manager and is therefore exempt as a "bona fide executive" under both the FLSA and the DCMWA, *id.* at 9–10.   The Court is unpersuaded by Defendants' first two arguments.   The Court is convinced, however, that Defendants' third argument raises disputed issues of fact and that, accordingly, the Court cannot grant summary judgment in favor of Seo on the present record.

To start, the Court has little trouble dispensing with Defendants' first argument—that the FLSA does not apply to Charlie's Corner.   Dkt. 23 at 8–9.   Defendants offer little by way of support for this position, aside from noting that "Charlie's Corner is a small store with [a] plexiglass wall separating the customers from the workers" and that its "customers point to the item they want and the employees get it for them."   *Id.* at 9.   For Charlie's Corner to be subject to FLSA, two requirements must be satisfied.   "First, [Charlie's Corner] must constitute an '[e]nterprise engaged in commerce or in the production of goods for commerce,'" and, "[s]econd, the [Plaintiffs] must be 'employees' within the meaning" of the statute.   *Tony & Susan Alamo Found.*, 471 U.S. at 295 (quoting 29 U.S.C. § 203(s)).   Defendants concede that Plaintiffs are "employees" for purposes of the FLSA, *see* Dkt. 22-1 at 2 (Defs.' Resp. to Pls.' Req. for Admis. ¶ 1) (admitting that "[e]ach plaintiff . . . was an 'employee'" as defined by FLSA), leaving only the question of whether Charlie's Corner is an "[e]nterprise engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 203(s).

The Supreme Court "has consistently construed the [FLSA] 'liberally to apply to the furthest reaches consistent with congressional direction.'"   *Tony & Susan Alamo Found.*, 471 U.S. at 296 (quoting *Mitchell*, 358 U.S. at 211).   The FLSA defines "commerce" to include "trade, commerce, transportation, transmission, or communication among the several States."   29 U.S.C. § 203(b); *see also id.* § 203(c) (defining "State" as "any State of the United States or the

District of Columbia").  A liquor store—even a local one like Charlie's Corner—satisfies this definition.  *See, e.g.*, *Shelton v. Ervin*, 646 F. Supp. 1011, 1015 (M.D. Ga. 1986) (finding local liquor store subject to the FLSA in part because the store necessarily purchased products that crossed state lines); *Si v. CSM Inv. Corp.*, No. 06-cv-7611, 2007 WL 1518350, at *3 (N.D. Cal. May 22, 2007) (similar for local seafood restaurant).  To find otherwise would frustrate the FLSA's "goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency," *Tony & Susan Alamo Found.*, 471 U.S. at 296.  The undisputed evidence, moreover, shows that Wade Road's sales exceeded $500,000 in 2017.  Dkt. 22-3 at 2 (2017 tax returns).

Defendants' next argument—that Oh is not an "employer," Dkt. 23 at 2—is similarly unavailing.  As an initial matter, it is not at all clear that this argument is properly raised.  In this Court, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived," *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013), and here Defendants merely reference, but do not elaborate on, the contention (raised in their answer) that "Defendant Charles Moon Suk Oh was not an employer under the statute." Dkt. 23 at 2.  In any event, the Court is unpersuaded by the contention that Oh merely worked for Wade Road and thus did not personally employ the Defendants.  *See* Dkt. 22-1 at 3 (Defs.' Resp. to Pls.' Req. for Admis. ¶ 3).

The "definition[s] of 'employer'" under the FLSA and DCWPCL are "coterminous," and under both statutes the term "is broadly construed," *Martinez v. Asian 328, LLC*, No. 15-cv-1071, 2016 WL 4621068, at *3–4 (D.D.C. Sept. 6, 2016); *see also Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5 & n. 2 (D.D.C. 2010).  "At minimum, an individual who exercises operational control over an employee's wages, hours, and terms of employment qualifies as an

'employer,' and is subject to individual liability." *Guevara v. Ischia, Inc.*, 47 F. Supp. 3d 23, 26 (D.D.C. 2014). This includes individuals who own or manage a business. *See Ventura,* 738 F. Supp. 2d at 6 (restaurant owner was individually liable as an employer because "he ha[d] operational control over the corporate defendants," had "a significant ownership interest in the corporate defendants," and had "the power to hire and fire, control work schedules and supervise employees, determine pay rates, and maintain employment records"); *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 102 n.1 (D.D.C. 2015) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."). Here, Oh owns Wade Road (which does business as Charlie's Corner), *see, e.g.*, Dkt. 22-1 at 22–23; *see also* Dkt. 5 at 2 (Answer ¶ 10), and, as a result, he had the authority to hire and fire employees of Charlie's Corner, Dkt. 22-2 at 9 (Answer ¶ 88) ("Mr. Oh hired Plaintiffs as an officer of Wade Road, Inc."); *see also* Dkt. 23 at 4 (admitting that "when Mr. Oh was at the store, he opened the store and when he was there at closing he closed it;" and that "Mr. Oh determined the prices and items sold at the store"). Nothing more is required to establish Oh's liability as an "employer" under the FLSA and DCWPCL.

This leaves Defendants' final threshold argument—that Seo was exempt from the protections afforded by the FLSA and DCMWA because he managed Charlie's Corner. Dkt. 23 at 9–10. The FLSA and DCMWA include "the same executive exemption," *Hernandez*, 210 F. Supp. 3d at 59 n.2, and under the FLSA exemptions operate as "affirmative defense[s] on which the employer has the burden of proof," *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974). To carry their burden on this point, Defendants must demonstrate that (1) Seo was "compensated . . . not less than $455 per week;" (2) his "primary duty [wa]s management of the

enterprise;" (3) he "customarily and regularly direct[ed] the work of two or more other employees;" and (4) he either had "the authority to hire or fire other employees," or his "suggestions and recommendations as to the hiring [and] firing . . . [we]re given particular weight."  29 C.F.R. § 541.100.

Seo concedes that "he was paid a salary of $5,000 a month," Dkt. 25 at 12, satisfying the first prong of this test.  The remaining three factors are disputed, however.  *See* Dkt. 23 at 9–10; Dkt. 25 at 11–16.  Defendants describe Seo as Charlie's Corner's "manager," Dkt. 23 at 10, and they assert in their responses to Plaintiffs' interrogatories that Seo "hired employees, determined their schedules, paid expenses related to the business, such a[s] rent and vendors, and performed duties typical of a manager of a business," Dkt. 23-4 at 2 (Defs.' Response to Pls.' Interrogs. ¶ 3); *see also id.* at 4 (Defs.' Response to Pls.' Interrogs. ¶ 4) ("Mr. Seo was the manager of the business and [the] rest of the plaintiffs were employees who worked as cashiers . . . Mr. Seo was responsible for scheduling the employees under his management.").  Oh, in his deposition, further testified that "Mr. Seo was the one who hired employees" and that "Mr. Seo was the one who prepared the reports" of each employee's time, Dkt. 23-19 at 8 (Oh Dep. 18:15–18:16); *see also id.* at 14 (Oh. Dep. 28:18).  Defendants also claim that "everyone else who work[ed]" at Charlie's Corner considered Seo to be "the manager at the store," Dkt. 23 at 10, and at least one Plaintiff (Tamara Agnew) testified that Seo "was introduced as [her] manager" and described Seo voiding transactions for cashiers and purchasing products on behalf of the store, Dkt. 22-13 at 5–6 (Agnew Dep. 15:12–17:17).   Agnew separately described Seo as the store's "hiring manager" and testified that in that capacity he hired at least three different employees, albeit when "Mr. Oh was out of town."  *Id.* at 21–22 (Agnew Dep. 20:19-21:5).

Plaintiffs respond that Seo was a cashier with "no managerial responsibilities," Dkt. 22 at 13, and, for support, they offer deposition testimony that Seo "didn't hire anyone," Dkt. 22-11 at 14 (Chase Dep. 25:4), and that Oh, not Seo, "ma[de] schedules" for employees, Dkt. 22-12 at 8 (Johnson Dep. 16:1–16:4).  Plaintiffs also offer evidence that Oh was disinclined to delegate supervision of the store to anyone; according to Johnson, employees understood that "if something [went] wrong, we have to call Mr. Oh, number one." *Id.* at 10 (Johnson Dep. 18:17–18:19).  Even when Oh "was out of town," Oh would "constantly call[], call [the] store, call [the] store." *Id.* at 13 (Johnson Dep. 25:8–25:9).  Plaintiffs further argue that, although Seo may have purported to hire employees while Oh was gone, when Oh returned to the store he refused to pay those employees; made clear "that Mr. Seo was not allowed to hire people when he was away;" and "yelled at Mr. Seo" for hiring employees.  Dkt. 22-7 at 2 (Johnson Decl.).  Even more categorically, Seo submitted a declaration attesting that he "had no managerial responsibilities" and that "Mr. Oh would daily dictate what [he] could and could not do."  Dkt. 22-9 at 1 (Seo Decl.).

Neither party can prevail at this stage on such a divided record.  Where, as here, "the underlying facts are in dispute," the determination whether an employee is exempt "under the FLSA is a mixed question of law and fact." *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 165 (D.C. Cir. 2015) (quotation marks omitted).  While "[t]he question of how the [employees] spent their working time . . . is a question of fact," "[t]he question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

Here, that first question—how Seo "spent [his] working time," *id.*—is disputed.  The parties point to conflicting evidence, for example, about whether Seo's "primary duty [wa]s

management" and whether he "customarily and regularly direct[ed] the work of two or more other employees," 29 C.F.R. § 541.100; *see* Dkt. 22-12 at 8 (Johnson Dep. 16:1–16:4) (testifying that Oh, not Seo, "ma[de] schedules" for employees); Dkt. 23-21 at 49 (Seo Dep. 48:4–48:5) (stating that Oh did not trust anyone to supervise the store and that "Mr. Oh did everything"); Dkt. 23-19 at 8 (Oh Dep. 18:15–18:16) (identifying Seo as "the one who prepared the reports" of each employee's time).  And, as previously noted, a genuine dispute remains as to whether Seo had "the authority to hire or fire other employees," 29 C.F.R. § 541.100; *see* Dkt. 22-11 at 14 (Chase Dep. 25:4) (testifying that Seo "didn't hire anyone"); Dkt. 23-13 at 21 (Agnew Dep. 20:19) (describing Seo as the "hiring manager").  On this record, it is for the trier of fact to decide whether Seo was "employed in a bona fide executive . . . capacity," 29 U.S.C. § 213(a)(1), such that he would be exempt from the FLSA and DCWPCL's overtime protections.

This means that Plaintiffs cannot prevail on their motion for summary judgment with respect to Seo' claims.  Because exemptions are affirmative defenses, *Corning Glass Works*, 417 U.S. at 196–97, Defendants "b[ear] the ultimate burden of proving" that Seo is exempt, *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 79 F. Supp. 3d 60, 73 (D.D.C. 2015), and, as explained above, Defendants have failed to carry that burden on the present record.  But that does not mean that Seo is entitled to summary judgment.  Rather, at this stage of the proceeding, all that Defendants must do is show that a genuine dispute of material fact exists with respect to whether Seo served in a managerial capacity.  As explained above, they have carried that modest burden.

The Court will, accordingly, deny Plaintiffs' motions for summary judgment with respect to Seo's claims under the FLSA and DCWPCL.

2.     *Plaintiffs' Compensation*

That leaves the question whether the remaining Plaintiffs have carried their burden of demonstrating—as matter of undisputed fact—that they were undercompensated and, if so, by how much.  The parties' arguments focus on the existence (or lack thereof) of pay records for Charlie's Corner, *see* Dkt. 22 at 19–20, 22; Dkt. 23 at 11, and so the Court first reviews "the framework for allocating burdens of proof in cases brought under the FLSA for unpaid wages or overtime compensation," *Arias v. U.S. Serv. Indus., Inc.*, 80 F.3d 509, 511 (D.C. Cir. 1996). Under that framework, Plaintiffs bear "the burden of proving that [they] performed work for which [they] [were] not properly compensated."  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  But "it is the employer who has the duty . . . to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed."  *Id.*; *see also* 29 U.S.C. § 211 (requiring employers to "make, keep, and preserve" of employees' "wages, hours, and other conditions and practices of employment").

And so "where the employer's records are inaccurate or inadequate," "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Anderson*, 328 U.S. at 687.  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Id.* at 687–88; *see also Serrano v. Chicken-Out Inc.*, 209 F. Supp. 3d 179, 187 (D.D.C. 2016) ("The *Anderson* standard also applies to claims under the DCMWA.").

Plaintiffs argue that "Defendants have no time records, tax records, schedules, or paystubs," Dkt. 22 at 6, which would mean that Plaintiffs need "show [only] the amount and extent of [their] work as a matter of just and reasonable inference," *Anderson*, 328 U.S. at 687. To make this showing, each Plaintiff submits a declaration with an estimate of the number of hours each worked and a total amount of unpaid wages. *See* Dkt. 22-9 at 2 (Chase Decl.) ("In total I believe I am owed $29,950 in unpaid minimum wages and overtime wages."); Dkt. 22-9 at 3 (Johnson Decl.) ("In total I am owed approximately $25,000 in unpaid minimum wages and overtime wages."); Dkt. 22-9 at 4 (Agnew Decl.) ("In sum I estimate I am owed $12,110 in unpaid minimum wages and overtime wages.").[4]

Defendants' response is somewhat muddled.  When Plaintiffs asked, during discovery, for "all documents regarding [Plaintiffs'] hours of employment and compensation," Defendants responded that "[a]ll hours of compensation and employment [were] recorded by Mr. Seo for 2017 while he was manager."  Dkt. 22-1 at 9 (Defs.' Resp. to Pls.' Req. for Produc. of Docs. ¶ 1).  Defendants "believed that Mr. Seo either destroyed or took with him most of the employment/ employee information" when he left Charlie's Corner, and so Defendants stated that "[t]here [we]re no documents" responsive to Plaintiffs' request.  *Id.* at 10 (Defs.' Resp. to Pls.' Req. for Produc. of Docs. ¶ 1).  Plaintiffs represent that Defendants "produced a total of seventeen (17) documents in discovery" and that the "only time records produced were undated sheets of notebook paper."  Dkt. 22 at 5 n.1.  Even assuming the accuracy of those handwritten notes, Defendants concede that they are incomplete.  *See, e.g.*, Dkt. 22-10 at 12–13 (Oh Dep. at 26:20–27:7) (conceding that one of the Plaintiffs worked for two weeks after the last date

---

[4]  As previously noted, Seo's claims are ineligible for summary judgment given the genuine dispute regarding his exemption status.  He claims, however, that he is "owed at least $7,728 in unpaid overtime wages and likely more."  Dkt. 22-9 at 1 (Seo Decl.).

recorded in the notes).  And, although Defendants also produced W-2's for Chase, Agnew, and Johnson for 2017, and a W-2 for Johnson for 2018, *see* Dkt. 23-11 at 1–2, Dkt. 23-12 at 1; Dkt. 25 at 3, those records merely reflect total wages, and not hours worked.

Following Plaintiffs' motion for summary judgment, however, Defendants produced a document titled "Employee Detail for Wade Road Inc." that seems to list its employees' compensation by pay period during the relevant time frame.  Dkt. 23-13 at 1–8.  Plaintiffs describe this document as "a previously undisclosed payroll data sheet," and note—based on a time stamp in its header—that it "appears to have been created on August 24, 2020."  Dkt. 25 at 4.  "This document was never disclosed during the discovery period by the Defendants," according to Plaintiffs, who only received it "in response to a subpoena on August 31, 2020."  *Id.* In addition, Defendants offer a declaration from Charles Oh, which disputes portions of Plaintiffs' evidence regarding the hours they allegedly worked, although that declaration does not even purport to set forth the exact hours each of the plaintiffs worked, Dkt. 23-16 at 2 (Oh Decl. ¶¶ 12–14) (describing weeks Chase allegedly worked, the shift Agnew "generally" worked, and providing no detail regarding the hours Johnson worked), and, in any event, does not bear Oh's actual signature, *id.* at 3 (Oh Decl.) (type-written signature).[5]

---

[5] Plaintiffs objected to this declaration on the ground (among others) that it is "unsigned."  Dkt. 25 at 4.  Defendants, in turn, failed to file a reply to Plaintiffs' opposition and, thus, have offered no response to that contention.  The Court tends to doubt that a declaration (like Oh's) that bears only the would-be declarant's name typewritten on the signature line, *see* Dkt. 23-16 at 3 (Oh Decl.), is properly "subscribed" and "executed" by the declarant within the meaning of 28 U.S.C. § 1746, particularly in the absence of any evidence that the declarant typed his own name or provided counsel with written authorization to execute the declaration on his behalf.  But because neither party has addressed this legal question, and because Defendants have shown that a genuine issue of material fact precludes summary judgment for Plaintiffs even without the Oh declaration, the Court will refrain from deciding that question on the present record.

Against this backdrop, the Court has little difficulty concluding that the adequacy of Plaintiffs' compensation is not fit for resolution on summary judgment.  To start, the Court cannot determine on the present record whether Defendants maintained the type of accurate and complete records required under the FSLA, and thus cannot (definitively) determine which party bears the burden of "com[ing] forward with evidence of the precise amount of work performed," *Anderson*, 328 U.S. at 687–88.  Although Defendants' contemporaneous records seem wholly inadequate, at least based on the evidence before it, the Court does not know what to make of the data contained in the "EMPLOYEE DETAIL for WADE ROAD INC."  Dkt. 23-13 at 1–8.

Two problems confront Defendants with respect to these records.  First, these records are dated August 24, 2020, at least suggesting that they were created for this litigation and were not kept in the ordinary course of Defendants' business.  *Id.*  But that is just a guess, and it is possible that the date reflects when the records were printed from an existing database.  Second, Defendants did not produce these records in discovery; instead, Plaintiffs report that they obtained the records pursuant to subpoena.  *See* Dkt. 25 at 4.  That provides cause for concern because, under Federal Rule of Civil Procedure 37, a party that "fails to provide information . . . as required by Rule 26(a) or (e) . . . is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  But, again, the present record is incomplete, leaving the Court to guess as to (1) whether these records were produced by Defendants' accountant; (2) if so, whether the records were within Defendants' control and thus subject to production under Federal Rule of Civil Procedure 26(a)(1)(A)(ii) and (e); and (3) whether Plaintiffs suffered any prejudice, since the records were apparently released before (albeit just before) discovery closed.

Even putting all of this aside, and regardless of whether the burden of production shifted to Defendants, the parties' dispute is not fit for resolution on summary judgment. The Court, of course, "cannot make credibility determinations regarding the parties' respective evidence on a motion for summary judgment," *Hernandez,* 210 F. Supp. 3d at 61, and Defendants have offered evidence that at least arguably controverts Plaintiffs' declarations. Thus, even if Defendants have not proven "the precise amount of work performed," they have introduced some doubt as to "the reasonableness of the inference to be drawn from [Plaintiffs'] evidence," *Anderson*, 328 U.S. at 687–88. "[I]n light of the conflicting evidence in the record, and the lack of any relevant documentation that might offer confirmation of how many hours [Plaintiffs] actually worked, summary judgment on the issue of liability would be inappropriate." *Guevara*, 47 F. Supp. at 28.

The Court will, accordingly, deny Plaintiffs' motion for summary judgment.

**B.      Defendants' Cross-Motion for Summary Judgment**

Finally, the Court turns to Defendants' cross-motion for summary judgment. Dkt. 23 at 10. According to Defendants, one plaintiff, Michelle Johnson, "settled with Defendants on all claims related to wage payment and overtime as of March 13, 2018." *Id.* The settlement on which Defendants rely is a handwritten note that provides "$500 – Special Bonus for Michelle Johnson for one year and over time paid." Dkt. 23-17. Plaintiffs respond that, among other things, "the document does not contain an express waiver of claims" and that, at any rate, "the agreement is not *bona fide*." Dkt. 22 at 20–21.

The Court is unpersuaded that Defendants are entitled to prevail on their release defense as a matter of law. As an initial matter, Plaintiffs are correct that nothing in the handwritten note that Defendants submit constitutes an express or otherwise clear release of claims. *See* Dkt. 23-17. That document refers to a "$500 Special *Bonus*," rather than any sort of settlement, *id*.

23

(emphasis added), and, although it also refers to "over time paid," *id.*, the Court cannot conclude as a matter of law that Johnson accepted the payment as full satisfaction of any and all claims to overtime that she had.  Indeed, Oh himself arguably disclaimed any such connection between that payment and this case during his deposition.  Dkt. 22-10 at 25 (Oh. Dep. 41:5–41:10) ("So even before she brought her lawsuit, I gave her $500 showing my appreciation . . .  I just gave her the money without—it had nothing to do with this case.").

Even if Johnson had contemplated a release of claims, moreover, such agreements are viewed with skepticism by the courts.  Congress enacted the FLSA "to protect certain groups of the population from substandard wages and excessive hours," which were driven in part by "unequal bargaining power as between employer and employee," and allowing "waiver of statutory wages by agreement would nullify the purposes of the Act."  *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706–07 (1945); *see also Beard v. D.C. Hous. Auth.*, 584 F. Supp. 2d 139, 143 (D.D.C. 2008) ("It is a long-held view that FLSA rights cannot be abridged or otherwise waived by contract because such private settlements would allow parties to circumvent the purposes of the statute by agreeing on subminimum wages.").  "While settlements between parties are expressly contemplated by Federal Rule of Civil Procedure 41, settlements of wage and hour disputes subject to the FLSA are different, since the FLSA's provisions are mandatory and generally are not subject to bargaining, waiver, or modification by contract or settlement."  *Sarceno v. Choi*, 66 F. Supp. 3d 157, 167 (D.D.C. 2014).

"Consistent with these principles," this Court has repeatedly "found that a private settlement agreement in an FLSA suit is only enforceable if the agreement 'resolves a bona fide dispute between the parties and the terms of the settlement are fair and reasonable.'"  *Abrego v. Yu Lin, Corp.*, 317 F. Supp. 3d 298, 302 (D.D.C. 2018) (quoting *Sarceno*, 66 F. Supp. 3d at 170).

"A settlement resolves a bona fide dispute if it 'reflects a reasonable compromise over issues *that are actually in dispute*, since merely waiving a right to wages owed is disallowed.'" *Id.* (quoting *Carrillo v. Dandan Inc.*, 51 F. Supp. 3d 124, 132 (D.D.C. 2014)).

Against this backdrop, Defendants urge this Court to conclude—as a matter of law—that just days before this suit was filed, on April 5, 2018, Dkt. 1, Johnson waived her claims for a total of $500, *see* Dkt. 23-17 (signed March 13, 2018). According to Johnson, Defendants owe her "approximately $25,000." Dkt. 22-9 at 3 (Johnson Decl.). "Defendants do not even argue, much less provide evidence, that at the time the parties executed the [settlement] they were settling a dispute between them regarding wages owed to plaintiff under the FLSA." *Hernandez*, 210 F. Supp. 3d at 62. And Defendants, likewise, "have set forth no evidence that the payment derived from negotiations between the parties as to the amount actually owed to plaintiff under the FLSA or had any relation whatsoever to such an amount." *Id.* To the contrary, Oh testified that the payment was intended only to "show[] [his] appreciation" and "had nothing to do with this case." Dkt. 22-10 at 25 (Oh. Dep. 41:5–41:10). On the present record, the Court is thus unpersuaded that the document relied upon by Defendants represents a "fair and reasonable" settlement of "a bona fide dispute between the parties," *Sarceno*, 66 F. Supp. 3d at 170.

The Court will, accordingly, deny Defendants' cross-motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion for summary judgment, Dkt. 22, and **DENIES** Defendants' cross-motion for summary judgment, Dkt. 23.

**SO ORDERED.**

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: September 23, 2021