**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| KANG KYU SEO, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 18-cv-785 (RDM) |
| CHARLES MOON SUK OH, *et al.*, | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On October 6, 2022, a jury returned a verdict in favor of all four Plaintiffs, finding that Charles Moon Suk Oh and Wade Road, Inc. failed to pay Plaintiffs overtime wages as required by the Fair Labor Standards Act ("FLSA"), the D.C. Wage Payment and Collection Law ("DCWPCL"), and the D.C. Minimum Wage Act ("DCMWA"). Following trial, Plaintiffs requested that the Court enter final judgment awarding them compensatory damages based on the jury's findings regarding the number of uncompensated overtime hours each Plaintiff worked, additional liquidated damages pursuant to D.C. Code § 32-1012(b)(1), and interest commencing in October 2022 pursuant to D.C. Code § 28-3302(c). Dkt. 61. For the reasons explained below, the Court will award compensatory and liquidated damages, albeit in amounts slightly different than those proposed by Plaintiffs, and will defer ruling on the availability of interest pending further briefing.

**A.**

For the most part, Defendants did not (at least at first) take issue with Plaintiffs' request for the entry of final judgment. They did not dispute Plaintiffs' calculation of compensatory damages, and they raised only one argument respecting the award of liquidated damages—that

is, the Court should not award liquidated damages because Plaintiffs failed to prove that Defendants "willfully" violated the FLSA.  Dkt. 62.  There are two problems with that argument. First, it misstates the standard for disallowing or reducing the award of liquidated damages under the FLSA.  Second, and more importantly, it ignores the fact that Plaintiffs' request for liquidated damages is premised not on the FLSA but, rather, on D.C. law.

Under the FLSA, an employer who fails to pay an employee the required "overtime compensation" is "liable to the employee" for the "amount of their unpaid . . . overtime compensation" and for "an additional equal amount as liquidated damages."  29 U.S.C. §§ 207, 216(b).  "[T]he Court has discretion," however, "to disallow or [to] reduce liquidated damages 'if the employer shows to the satisfaction of the [C]ourt that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of [the FLSA].'"  *Gainor v. Optical Soc'y of Am., Inc*., 206 F. Supp. 3d 290, 306 (D.D.C. 2016) (some alterations in original) (quoting 29 U.S.C. § 260). "This good faith defense to liquidated damages requires 'an affirmative showing of a genuine attempt to ascertain what the law requires,' not simply the absence of bad faith."  *Thompson v. Linda And. A., Inc*., 779 F. Supp. 2d 139, 153 (D.D.C. 2011) (quoting *Danesh v. Rite Aid Corp*., 39 F. Supp. 2d 7, 13 (D.D.C. 1999)).  The good-faith defense, moreover, requires both "a subjective inquiry" into the employer's beliefs and application of "an objective standard."  *Laffey v. Nw. Airlines, Inc*., 567 F.2d 429, 464 (D.C. Cir. 1976), *overruled in part on other grounds*, *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 134 (1988); *see also* 29 U.S.C. § 260.  Notably, the employer bears the burden of proving that it acted in good faith and that liquidated damages are unwarranted.  *See Orellana v. NBSB Inc*., 332 F. Supp. 3d 252, 262 (D.D.C. 2018).

Here, Defendants would flip (and increase) this burden of proof, requiring the employee to prove that her employer's "violation was 'willful' under the FLSA."  Dkt. 62 at 2.  In their view, Plaintiffs have failed to satisfy that demanding burden because Plaintiffs presented "no evidence . . . to show that Defendants possessed the level of recklessness required to warrant [the award of] liquidated damages."  *Id.* at 4.  For the reasons just explained, that argument grossly misstates the law.

Defendants premise their argument to the contrary on a single case, *Souryavong v. Lackawanna*, 872 F.3d 122 (3d Cir. 2017).  That case, however, has nothing to do with the standard for awarding liquidated damages under the FLSA.  Instead, the Third Circuit merely addressed whether the district court had correctly applied a different provision of the FLSA, 29 U.S.C. § 255(a), which extends the FLSA statute of limitations from two to three years when the employee's "cause of action aris[es] out of a willful violation" of the statute.  Far from embracing Defendants' view of the separate liquidated damages rule, the Third Circuit cautioned that, "[a] lack of evidence going to good faith," which relates to the award of liquidated damages, is not the same as evidence in support of "intentionality," which is required to extend the statute of limitations.  *Souryavong*, 872 F.3d at 127.

In any event, Defendants' focus on the FLSA's good-faith affirmative defense to the award of liquidated damages is beside the point, because Plaintiffs have requested that the Court award liquidated damages pursuant to the DCMWA.  Dkt. 61 at 1.  Because the standards of *liability* under the DCMWA and the FLSA "parallel" one another, the Court—with the parties' agreement—submitted the questions of liability under both statutes to the jury concurrently.  *See* Dkt. 56 at 21 (explaining that "[t]he relevant provisions of the D.C. Minimum Wage Act mirror the relevant provisions of the FLSA" and that, as a result, the Court's instructions on the FLSA

apply to both statutes).  That symmetry, however, does not extend to awards of *liquidated*

*damages*.  Awards of liquidated damages under the FLSA and DCMWA are not cumulative and,

because D.C. law "is more generous to employees," this Court typically "first assesses whether

liquidated damages should be awarded under District of Columbia law" and, if so, does not

separately consider whether liquidated damages are also available under the FLSA.  *Sanchez v.*

*Devashish Hosp., LLC*, 322 F.R.D. 32, 38 (D.D.C. 2017) (cleaned up); *see also Portillo v. Smith*

*Commons DC, LLC*, 2022 WL 3354730, at *7 (D.D.C. Aug. 13, 2022) ("Because the Plaintiffs

seek recovery under both the FLSA and the DCMWA, the Court will assess liquidated damages

under District of Columbia law, given that it provides for more generous liquidated damages.");

*Denson v. DC Rest. Holdings, Inc*., 2021 WL 4988994, at *3 (D.D.C. Oct. 27, 2021) ("These

provisions are not cumulative; '[s]ince D.C. law is more generous to employees on the relevant

points, the Court will . . . assess damages under D.C. law and will not award a duplicative

amount pursuant to federal law.'" (alterations in original) (quoting *Ventura v. L.A. Howard*

*Constr. Co*., 134 F. Supp. 3d 99, 104 (D.D.C. 2015)).

The DCMWA, like the FLSA, provides for liquidated damages, but the penalties under

D.C. law are higher:

> Except as provided in paragraph (2) of this subsection, any employer who pays
> any employee less than the wage to which that employee is entitled under this
> subchapter shall be liable to that employee in the amount of the unpaid wages,
> statutory penalties, and an additional amount as liquidated damages equal to
> *treble the amount* of unpaid wages.

D.C. Code § 32-1012(b)(1) (emphasis added).  More importantly for present purposes, the

Court's authority to decline to award liquidated damages under the DCMWA is more narrowly

drawn than under the FLSA.  Under D.C. Code § 32-1012(b)(2),

> The court may award an additional amount of liquidated damages less than treble the amount of unpaid wages, but not less than the amount of unpaid wages, *only if* the employer demonstrates to the satisfaction of the court that:
>
> (A)    The act or omission that gave rise to the action was in good faith;
>
> (B)    That the employer had reasonable grounds for the belief that the act or omission was not in violation of this subchapter; and
>
> (C)    That the employer promptly paid the full amount of wages claimed to be owed to the employee.

*Id.* § 32-1012(b)(2) (emphasis added).[1]  In other words, the Court *must* impose treble liquidated damages, *unless* the employer carries its burden on proving that it acted in good faith; that it's belief was reasonable; and that it "promptly paid" the employee "the full amount of wages claimed." *Id.*

Here, Defendants have made no effort to meet this burden.  They have offered no evidence that they had a good faith belief that no overtime wages were due or that any such belief was objectively reasonable.  But, even if they had, their defense would fail, because they have not—to date—paid Plaintiffs the overtime wages that they claim, and they certainly did not do so "promptly."  *See Orellana*, 332 F. Supp. 3d at 262 (awarding treble liquidated damages because defendants did not "promptly repa[y] the waged owed").  The Court, accordingly, is without discretion to decline Plaintiffs' demand for the award of liquidated damages pursuant to D.C. Code § 32-1012(b).  Although perhaps a severe remedy, that provision requires the Court to

---

[1] The DCWPCL allows liquidated damages to be calculated as "10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to treble the unpaid wages, whichever is smaller."  D.C. Code § 32-1303(4).  Because Plaintiffs seek the treble damages permitted under the DCMWA, and Defendants do not argue that the alternative remedy applies here, the Court need not address the alternative remedy.  In any event, using the 10 per centum calculation would seem to result in a higher damages award.  *See, e.g.*, *Amaya v. Logo Enterprises, LLC*, 251 F. Supp. 3d 196, 201 n.5 (D.D.C. 2017).

award what amounts to quadruple damages: compensatory damages equal to the unpaid overtime wages *plus* liquidated damages equal to three times that amount. *See Portillo*, 2022 WL 3354730, at *7; *see also* D.C. Code § 32-1012(b)(1) ("[A]ny employer who pays any employee less than the wage to which that employee is entitled under this subchapter shall be liable to that employee in the amount of *the unpaid wages*, statutory penalties, *and an additional amount as liquidated damages equal to treble the amount of unpaid wages*.") (emphasis added).

**B.**

Although Defendants raised only one objection to Plaintiffs' request for the entry of final judgment, the Court raised two additional issues sua sponte:  First, Danita Chase, Michelle Johnson, and Tamora Agnew all worked during periods of time when the minimum wage changed in D.C., but for Chase and Johnson, the jury was not asked to specify her exact start and end dates.  Thus, for those two Plaintiffs, determining the amount of the compensatory award required more than "a formulaic or mathematical calculation of damages," *Martinez v. Asian 328, LLC*, 220 F. Supp. 3d 117, 120 (D.D.C. 2016) (quoting *Monroe v. FTS USA, LLC*, 815 F.3d 1000, 1022–23 (6th Cir. 2016)).  Second, the jury found that Tamora Agnew worked from February 20, 2017 to August 1, 2017, which is approximately 23 weeks.  Dkt. 59 at 6 (Jury Verdict).  But, in a separate finding, the jury also found that Agnew worked 28 weeks, *id.*, raising the question whether the Court should award damages to Agnew for 23 or 28 weeks, Min. Order (11/02/2022).  The Court, accordingly, ordered that the parties file supplemental briefs addressing these questions.

1.

In response to the Court's first question, Plaintiffs contend that Chase "is owed 7 weeks of wages at the base rate of $10.50 per hour," which was the prevailing minimum wage in the

6

D.C. prior to July 1, 2016, and is owed "34 weeks of wages at the base rate of $11.50 per hour," which became the prevailing minimum wage on July 1, 2016.  Dkt. 65 at 5.  As they explain, Defendants admitted in their answer to the complaint that "Chase . . . worked at Charlie's Corner from May 2016 through February 2017, approximately forty-one . . . weeks."  Dkt. 1 at 5 (Compl. ¶ 24); Dkt. 5 (Answer ¶ 24) ("Admitted").  The difficulty is that approximately 43 weeks passed from the beginning of May to the end of February, and the admission does not indicate whether Chase started work at the very beginning of May or in the middle of the month, and her start date will have a bearing on the number of weeks that she worked at the lower minimum wage.  This will have only a modest effect on the Court's award of damages, but a modest error is an error nonetheless.

In Plaintiffs' view, the Court should set Chase's start date at May 8, 2016, because she testified at trial that she recalled starting work on May 5, 2016, which was a Thursday, and "her first full week of work would have begun on Sunday, May 8, 2016."  Dkt. 65 at 6.  Defendants do not dispute this testimony or point to any conflicting testimony but, instead, argue that they are entitled to a new trial because determining Chase's start date required a "finding of fact regarding a very element of [her] FLSA claim," and Plaintiffs had the burden of proving their case.  Dkt. 66 at 3.  The Court agrees with Defendants that Plaintiffs bear the burden of proof with respect to compensatory damages—including establishing Chase's start date to the extent that date has any bearing on the applicable minimum wage—but disagrees that only the jury, and not the Court, can resolve that question.

Federal Rule of Civil Procedure 49(a)(3) speaks directly to the question posed.  Under that rule, "[a] party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to jury unless, before the jury retires, the party demands its

submission to the jury." Fed. R. Civ. P. 49(a)(3).  And, "[i]f the party does not demand

submission, the court may make a finding on the issue." *Id.*  Here, the parties agreed to the

verdict form, which asked the jury only to specify "the number of weeks [Chase] worked and

average number of hours over forty that [she] worked per week from May 2016 through

February 2017."  Dkt. 59 at 4; *see also* Rough Trial Tr. at 124–25, 131 (Oct. 5, 2022).  And,

although the D.C. minimum wage increased in July 2016, Defendants did not request that the

Court submit the question of Chase's precise start date to the jury.  Rule 49(a)(3) "puts the

burden of securing a jury verdict on all of the meaningful issues in the case squarely on the

parties," and, "[i]f the right to [a] jury trial has been waived on an issue by a failure to demand its

submission, the trial judge should make his or her own finding of fact on that issue."  9B Wright

& Miller, *Federal Practice and Procedure* § 2507 (3d ed. 2022); *see also Lewis v. District of

Columbia*, 315 F. Supp. 3d 571, 580 (D.D.C. 2018).  That is what happened here, leaving it to

the Court to determine Chase's start date.

    In the present context, that task is not a difficult one.  The only evidence that either party

cites is Chase's unrebutted testimony that she started work on May 5, 2016.  Rough Trial Tr. at

128 (Oct. 3, 2022).  Nor is there any reason to doubt the veracity of that testimony:  Chase

testified that she was arrested that night and therefore remembers the precise date  *Id.*  Indeed,

even if the Court were to indulge every inference in Defendant's favor, Chase's first full week of

work would shift forward by only one week, resulting in a difference in compensatory damages

of about $30.  The Court, accordingly, finds by a preponderance of the evidence that Chase's

first full week of work began on May 8, 2016.  This means that she worked approximately 7.7 of

her 41 weeks (54 days) prior to July 1, 2016 (when the D.C. minimum wage was $10.50) and

that she worked approximately 33.3 weeks (233 days) after July 1, 2016 (when the D.C. minimum wage was $11.50).

The same general framework applies to the question of when Johnson began work, although the factual basis for Plaintiffs' argument is different.  In particular, Plaintiffs note that Defendants admitted that Johnson worked at Charlie's Corner from January 2017 until February 2018.  Dkt. 1 at 6 (Compl. ¶ 32); Dkt. 5 at 3 (Answer ¶ 32) ("Admitted").  Although it is less clear whether she worked full or part-time in January and February 2018, *see* Dkt. 1 at 6 (Comp. ¶ 32) (asserting both that she worked full time through February 2018 and that "[s]he worked part-time for Defendants in January and February 2018"), Defendants clearly admitted that Johnson worked "full time at Charlie's Corner" prior to January 2018, *id.*; Dkt. 5 at 3 (Answer ¶ 32).  On this basis, the parties agreed to a verdict form that asked the jury to specify "the number of weeks [Johnson] worked and the average number of hours over forty that [she] worked per week from January 2017 through December 2017," Dkt. 59 at 5, and the jury found that she worked "50 weeks" at an average number of overtime hours of 30.32 per week, Dkt. 59 at 5.

To the extent any question exists with respect to whether the jury was asked to find the precise date on which Johnson started work at Charlie's Corner, the Court concludes that Defendants have waived their right to a jury trial on that question and that, pursuant to Rule 49(a)(3), "the court may make a finding on the issue."  And the evidence, once again, is one sided.  As the Court construes Plaintiffs' complaint and Defendants' answer, Defendants admitted that Johnson worked full-time at Charlie's Corner through the end of December 2017.  Counting backwards, this means that Johnson worked 23.7 of her 50 full-time weeks (166 days)

prior to July 1, 2017 (when the D.C. minimum wage was $11.50), and 26.3 weeks (184 days) after July 1, 2017 (when the D.C. minimum wage was $12.50).

The Court will, accordingly, use these dates in calculating the compensatory damages that Chase and Johnson are due.

2.

The Court's second question addressed an inconsistency in the jury's verdict.  Because Defendants did not admit the dates that Agnew worked, the jury was required to decide both the dates she worked and the total number of weeks and average hours of overtime that she worked over that time span.  *Compare* Dkt. 1 at 7 (Compl. ¶ 40), *with* Dkt. 5 at 3 (Answer ¶ 40 ("Denied, demand strict proof at trial")); *see also* Dkt. 59 at 6.  The jury's findings, however, do not jibe.  It found that Agnew worked from February 20, 2017 to August 1, 2017—a period of about 23 weeks—and that she worked a total of 28 weeks.  Dkt. 59 at 6.  In Plaintiffs' view, the Court can cure this inconsistency by giving Defendants the benefit of the doubt and using the more conservative finding of 23 weeks to calculate the amount of compensatory and liquidated damages Defendants must pay.  Dkt. 67 at 4.  Defendants, in contrast, argue that "there [is] no way to reconcile the jury's findings" and that, as a result, the Court must set aside the jury's verdict and grant Defendants a new trial with respect to Agnew's claims.  Dkt. 66 at 2.

Under Federal Rule of Civil Procedure 49(b), if the jury's answers to written questions "are inconsistent with each other and one or more is also inconsistent with the general verdict," the Court may either "direct the jury to further consider its answers and verdict[] or . . . order a new trial."  Fed. R. Civ. P. 49(b)(4).  That rule does not fit neatly here because the parties have left it to the Court to enter the general verdict (assessing the total amount of damages due) based on the jury's answers to the written questions posed.  But it is safe to assume that whatever

10

general verdict the Court enters will necessarily be inconsistent with either (1) the jury's finding that Agnew worked at Charlie's Corner from February 20, 2017 to August 1, 2017, or (2) its finding that she worked a total of 28 weeks.  For present purposes, the Court will, accordingly, assume that Rule 49(b) applies.

The problem that Defendants face, however, is that they did not raise this inconsistency until long after the jury was discharged, thereby depriving Agnew of the opportunity to request that the Court resubmit the question to the jury.  Had Defendants raised the issue in a timely manner, the inconsistency could have been easily addressed, with minimal cost to Plaintiffs and without requiring a new trial before a new jury.  Under these circumstances, courts routinely hold that "if a party fails to object to an inconsistency in a . . . verdict before the jury is excused, that party waives any objection in that regard."  *Frank C. Pollara Grp. v. Ocean View Inv. Holdings, LLC*, 784 F.3d 177, 191 (3d Cir. 2015) (collecting cases); *see also* 9B Wright & Miller, Federal Practice and Procedure § 2513 (3d ed. 2022).  Decisions from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh circuits all embrace this rule.[2]

---

[2]  *See, e.g.*, *Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 63 (1st Cir. 2002) ("We have held that under Rule 49(b), objections to the inconsistency of verdicts must be made after the verdict is read and before the jury is discharged."); *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury."); *In re Processed Egg Prods. Antitrust Litig.*, 962 F.3d 719, 729 (3d Cir. 2020) ("To the extent the plaintiffs are arguing that the jury's verdict is somehow internally inconsistent . . . [t]hey waived any such argument by failing to object to the verdict before the jury was discharged."); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 726 (4th Cir. 1999) ("[A] litigant's failure to raise an inconsistency before the jury is discharged renders Rule 49(b) inapplicable and thus precludes that litigant from relying upon the inconsistency to challenge an adverse disposition."); *Team Contractors, L.L.C. v. Waypoint Nola, L.L.C.*, 976 F.3d 509, 515 (5th Cir. 2020) ("[I]f there is a general verdict with written questions, arguments about inconsistency are waived by not raising them until after the jurors are discharged."); *Fencorp, Co. v. Ohio Kentucky Oil Corp.*, 675 F.3d 933, 944 (6th Cir.

The only case that has touched on this issue in the D.C. Circuit, however, provides minimal guidance.  In that case, *Hundley v. District of Columbia*, 494 F.3d 1097 (D.C. Cir. 2007), the court rejected the defendants' waiver argument, but on fact-specific grounds.  *Id.* at 1103.  As the court explained, in that case, "the plaintiffs repeatedly objected at trial to the proposed written interrogatory," and the defendants themselves "acknowledged and foreshadowed the potential for inconsistency" raised by verdict form.  *Id.*  As the court further noted, the defendants "cited no case supporting waiver"—from *any* circuit—"when:"

> (i)  a party objected to a written interrogatory; (ii) the district court dismissed the jury after receiving the verdict without asking the parties whether they had any objections to the verdict; and (iii) the party raised an inconsistent verdict argument—based on the previously objected-to written interrogatory—in its post-trial motion for judgment as a matter of law or a new trial.

*Id.*  The D.C. Circuit took care, however, to limit the reach of its holding, stressing that it merely agreed "[u]nder these narrow circumstances" that the plaintiffs had "not waived [their] objection to an inconsistent verdict caused in part by a written interrogatory."  *Id.*

---

2012) ("Defendants failed to raise th[e] argument that the jury's verdict was internally inconsistent before the jury was discharged and, consequently, have waived this objection."); *Cont'l Vineyard, LLC v. Vinifera Wine Co.*, LLC, 973 F.3d 747, 754 (7th Cir. 2020) "([A] party wishing to challenge a jury's general verdict on the ground of inconsistent verdicts must normally make a contemporaneous objection before the jury disbands."); *Chem-Trend, Inc. v. Newport Indus., Inc.*, 279 F.3d 625, 629 (8th Cir. 2002) ("[T]o the extent Chem-Trend claims an inconsistency in the verdicts, Chem-Trend waived the challenge by failing to object before the district court discharged the jury."); *Flores v. City of Westminster*, 873 F.3d 739, 757 (9th Cir. 2017) ("As the district court correctly concluded, the Chiefs waived any objection to the jury's allegedly inconsistent answers when they failed to object before the jury was discharged."); *Johnson v. Ablt Trucking Co.*, 412 F.3d 1138, 1141 (10th Cir. 2005) ("[A] party waives the right to object to inconsistencies in a general verdict with special interrogatories if it does not object on that ground before the jury is discharged unless the verdict is inconsistent on its face such that the entry of judgment upon the verdict is plain error.") (internal quotation marks and citation omitted)); *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1419 (11th Cir. 2011) ("We have held that if the party challenging [a general verdict with written interrogatories] has failed to object before the jury is discharged, that party has waived the right to contest the verdicts on the basis of alleged inconsistency.") (internal quotation marks and citation omitted)).

Read in this light, the *Hundley* decision does not place the D.C. Circuit on a different path from all other circuits and does not call into question the general rule that a party wishing to challenge an inconsistent verdict must do so before the jury is discharged.  Indeed, the two courts that have considered just this question agree that *Hundley* stands for the narrow proposition that the waiver rule does "not apply when a party object[s] to a written interrogatory as likely to cause an inconsistency before the case [is] submitted to the jury," even if that party "fail[s] to object after the jury return[s] an inconsistent verdict as predicted."  *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 538 n.4 (8th Cir. 2015); *see also President & Dirs. of Georgetown Coll. v. Wheeler*, 75 A.3d 280, 288 n.4 (D.C. 2013).

A close reading of *Hundley*, moreover, verifies that conclusion.  Two points, in particular, bear mention.  First, although the D.C. Circuit noted that "the district court dismissed the jury . . . without asking the parties whether they had any objections to the verdict," the court also noted that the district court's actions in this respect were "[c]onsistent with ordinary practice."  *Hundley*, 494 F.3d at 1103.  Second, the court stressed that the plaintiffs' motion for a new trial "raised an inconsistent verdict argument . . . *based on the previously objected-to written interrogatory*."  *Id.* (emphasis added).  In other words, the plaintiffs relied on an objection that they had, in fact, raised, even though they did not separately object when the consequences that they had foreshadowed materialized.

Here, in contrast, Defendants agreed to the relevant jury instructions and to the verdict form, and they never raised any pertinent objection until after (1) the jury was discharged; (2) Plaintiffs submitted their proposed final judgment; (3) Defendants responded to that proposal; and (4) the Court, then, sua sponte inquired about the inconsistency.  At every step along the way, Defendants could have objected—to the jury instructions, the verdict form, the discharge of

13

the jury without resubmitting any questions, and Defendants' proposed final judgment—but did not.  Under these circumstances, the Court is persuaded that Defendants waived any objection to the inconsistency in the jury's answers to the Court's special interrogatories.  To hold otherwise would unfairly prejudice Agnew, who would need to bear the expense of a second trial, at least on the question of damages, as a result of Defendants' late objection.

This conclusion, however, does not end the matter, because the Court must also consider whether the Court's failure to grant a retrial would result in a "fundamental error" or would rise to the level of "clear error."  *See Hudley*, 494 F.3d at 1103 n.3.  Although the D.C. Circuit had no need to elaborate on the plain error doctrine in *Hundley*, the court cited to three circuit court opinions that at least briefly discuss the issue.  *Id.* (citing *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir. 2005); *Johnson*, 412 F.3d at 1141; *Strauss v. Stratojac Corp.*, 810 F.2d 679, 683 (7th Cir. 1987)).  In each of these cases, the courts recognized that an unflinching adherence to the waiver rule can, at times, undermine "the very integrity of the trial" and thus ought not stand.  *See Armstrong*, 425 F.3d at 136.  Although "plain error" is a concept that typically governs appellate review of issue not raised in the district court, the concept is akin to the standard applicable in the district courts under Federal Rule of Civil Procedure 59(a), which typically requires a "manifest error of law or fact," *In re Lorazepam & Clorazepate Antitrust Litigation*, 467 F. Supp. 2d 74, 87 (D.D.C 2006), and some harm to the moving the party, *see, e.g.*, *Caudle v. District of Columbia*, 707 F.3d 354, 359 (D.C. Cir. 2013) ("A new trial is unwarranted if the trial error is harmless."); *Morris v. Pruitt*, 308 F. Supp. 3d 153, 159 (D.D.C. 2018) (result must have been "unfair to the moving party" (quoting *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015))); *Lewis*, 315 F. Supp. 3d at 577 (same).  Consistent with this rule, courts have at times imposed a harm requirement before

ordering a new trial based on allegedly inconsistent verdicts.  *See*, *e.g.*, *Abou-Khadra v. Mahshie*, 4 F.3d 1071, 1080 (2d Cir. 1993) ("[E]ven if there was an inconsistency in the jury's answers to the RICO interrogatories, Abou-Khadra was in no way harmed as a result."); *Evans v. Washington Metro. Area Transit Auth.*, 816 F. Supp. 2d 27, 34 (D.D.C. 2011) ("[T]he disputes surrounding the jury's answers to these questions would still not merit a new trial because the jury's answers to No. 3c and 3d would not materially change the result of trial.").

In the present context, Defendants have little to complain about.  To be sure, the jury's findings regarding the dates Agnew worked and the number of weeks she worked are inconsistent.  But this is not a case in which the jury was required to choose between "[t]wo distinct versions of events" yet chose both.  *Cf. Hudley*, 494 F.3d at 1102.  Rather, on the central question, the jury indisputably found in Agnew's favor: whether Defendants "failed to pay [her] overtime pay required by law."  Dkt. 59 at 6.  The sole question at issue is how many weeks Agnew worked, and, on that question, Agnew has agreed to accept the version of the jury's verdict that is less favorable to her and more favorable to Defendants.  As a result, if anything, Defendants stand to *benefit* from the inconsistent verdicts.  Nor is there is any reason to believe that the inconsistency in the jury's verdicts suggests that the jury was so confused that it was incapable of rendering a fair verdict.  To the contrary, with respect to each of the other Plaintiffs, the jury accurately counted the number of weeks worked.  When it came to Agnew, however, it appears that the jury either miscounted the number of weeks from February 20, 2017 to August 1, 2017 or, quite possibly, simply misread a "3" as an "8" when it reported its calculations on the verdict form.  Either way, there is no reason to presume that when it came to Agnew—as opposed to the other Plaintiffs—the jury fundamentally "erred in the legal reasoning by which it

proceeded." *Elliott v. Watkins Trucking Co.*, 406 F.2d 90, 92 (7th Cir. 1969).  And, either way, if the Court accepts Agnew's concession, Defendants will suffer no cognizable harm.

The Court will, accordingly, use the jury's finding that Agnew worked for Defendants from February 20, 2017 to August 1, 2017 in calculating the compensatory damages that Agnew is due.

### C.

That leaves the question of interest.  According to Plaintiffs, they are each entitled to an additional award of interest "at the rate of 5%" starting on October 6, 2022.  Dkt. 61-1 at 1-2. Plaintiffs fail to explain why they are entitled to the payment of interest running from the date of the jury's verdict but, rather, merely cite to D.C. Code § 28-3302(c).  That provision, however, sets the prevailing interest rate "on judgments and decrees," *id.*, and is thus seemingly inapposite, since the Court has yet to enter judgment, *see Zuniga v. Whiting-Turner Contracting Co.*, 270 A.3d 897, 902 (D.C. 2022) (holding that "judgment" under that statute is a final, appealable order).  But because neither party has briefed this issue, and because Plaintiffs have requested the opportunity to heard on the question, Dkt. 61 at 2, the Court will defer ruling on the question of interest at this time.

**CONCUSION**

In light of the conclusions set forth above, the Court finds that Plaintiffs are entitled to

compensatory and liquidated damages in the following amounts:

| Plaintiff | Compensatory Damages | Liquidated Damages (Compensatory Damages x 3) | Total Damages (Compensatory + Liquidated Damages) |
|---|---|---|---|
| **Kang Kyu Seo** | $31,762.13[3] | $95,286.39 | $127,048.52 |
| **Tamora Agnew** | $9,821.20[4] | $29,463.60 | $39,284.80 |
| **Danita Evette Chase** | $20,870.36[5] | $62,611.07 | $83,481.43 |
| **Michelle Johnson** | $27,346.48[6] | $82,039.44 | $109,385.92 |

[3] Seo's hourly wages were $18.59 (40 hours per week + 40.68 hours per week overtime = 80.68/week.  $1,500 (Seo's weekly wage) / 80.68 = $18.59).  He worked 1,139.04 overtime hours (28 weeks x 40.48 hours/week).  His total unpaid wages therefore amount to $31,762.13 ($18.59 x. 1,139.04 x 1.5).

[4] As relevant to Agnew, who worked between February and August 2017, the D.C. minimum wage was raised from $11.50 to $12.50/hour on July 1, 2017.  D.C. Code § 32-1003(a)(5)(A)(ii). Per the verdict, Agnew worked from February 20, 2017 to June 30, 2017 at $11.50/hour, resulting in compensatory damages of $7,760.63 (1.5 x $11.50 x 24.04 hours/week x (131 days/7)).  She then worked July 1, 2017 to August 1, 2017 at $12.50/hour, resulting in compensatory damages of $2,060.57 (1.5 x $12.50 x 24.04 hours/week x (32 days/7)).  Her total compensatory damages thus come out to $9,821.20.

[5] Chase worked 7.7 weeks at $10.50/hour, D.C. Code § 32-1003(a)(1)(4), and 33.3 weeks at $11.50/hour, D.C. Code § 32-1003(a)(1)(5)(A)(i) (41 weeks in total).  For the first 7.7 weeks, Chase should have earned $3,645.00 in overtime pay (1.5 x $10.50/hour x 30 hours/week overtime x (54 days / 7)).  Then, for the 33.3 weeks, Chase should have earned $17,225.36 in overtime pay (1.5 x $11.50 x 30 hours/week overtime x (233/7)).  In total, then, Chase is owed $20,870.360 in compensatory damages.

[6] For the first 23.7 weeks, Johnson should have earned $11.50/hour, and for the last 26.3 weeks, she should have earned $12.50/hour.  *See* D.C. Code § 32-1003(a)(1)(5)(A)(i)-(ii).  For the first 23.7 weeks, Johnson should have been paid $12,403.05 (1.5 x $11.50/hour x 30.32 hours overtime /week x (166 days / 7)).  And for the last 26.3 weeks, Johnson should have been paid $14,943.43 (1.5 x $12.50/hour x 30.32 hours overtime/week x (184 days / 7)).  In total, then, Johnson is owed $27,346.48.

The parties are hereby **ORDERED** to submit any further argument on the question of interest on or before January 18, 2023.  The parties' briefs shall not exceed five pages per side. After the Court has reviewed those filings, the Court will enter final judgment.

    **SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 10, 2023